FILED
2025 Sep-30  PM 12:47
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **WILLIAM K. DIVER,** | ) | |
| *Administrator of the Estate of* | ) | |
| *Amanda Mooney Falkner,* | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 2:23-cv-00005-AMM** |
| | ) | |
| **JOHN SAMANIEGO,** *et al.,* | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

This case is before the court on five motions for summary judgment by defendants Shelby County Sheriff John Samaniego, Captain Mark Bishop, Deputy Michael Cooper, Deputy Alex Davis, and Deputy Darin Banks, Docs. 77, 79, 81, 97, 98, and a motion to strike by Deputy Banks, Deputy Cooper, and Deputy Davis ("the deputies"), Doc. 117. For the reasons stated below, the motion to strike, Doc. 117, is **DENIED**, the motions for summary judgment by Sheriff Samaniego and Captain Bishop, Doc. 77, 79, are **GRANTED**, and the motions for summary judgment by the deputies are **GRANTED IN PART** and **DENIED IN PART**.

## I.    BACKGROUND

These are the relevant undisputed facts and factual disputes.

## A. The Events of January 4, 2021

### 1. The 911 Phone Call and The Deputies' Response

On January 4, 2021, Sam Horton and Terry Falkner called 911 to report a domestic violence dispute between Mr. Falkner and his wife, Amanda Falkner. *See* Docs. 89-1–89-2; Doc. 109-1. Deputy Cooper and Deputy Davis, two deputies with the Shelby County Sheriff's office, responded to the call. *See* Doc. 109-2 at 34; Doc. 109-14 at 2; Doc. 109-16 at 2.

The only information known to the two deputies before arriving at the scene was (1) there was a domestic violence dispute involving an individual who potentially had a gun, (2) one of the individuals had been physically abusive towards the other, and (3) one of the individuals was prevented from leaving the premises by a locked gate that blocked the end of the driveway. *See* Doc. 109-15 at 2; Doc. 109-16 at 2; Doc. 109-1 at 2–3; Doc. 109-2 at 34; Doc. 109-3 at 12–13; Doc. 109-4 at 38.

What happened when the deputies arrived at the residence is captured in part by the dash cameras on their vehicles. *See* Docs. 109-17–109-22. Although the deputies were not wearing body cameras, they were wearing body microphones that connected to the visual footage from the dash cameras located in their patrol cars. *See* Doc. 109-2 at 11; Doc. 109-19; Doc. 109-5 at 11; Doc. 109-7 at 21. The dash cameras recorded video footage of the gate at the end of the Falkners' driveway

throughout the evening, *see* Docs. 109-17, 109-19, 109-22, but at some point, the body microphones lost connection to the dash cameras because of the deputies' distance from the patrol cars, and only the audio from the microphones located inside the patrol cars is audible on the videos, *see* Doc. 109-19; Doc. 109-5 at 11; Doc. 109-7 at 21, 33.

The dash cameras show Deputy Cooper and Deputy Davis arriving at the gate located at the end of the Falkners' driveway around 5:50 PM. *See* Doc. 109-17 at 4:01–4:06; Doc. 109-19 at 3:52. There were two cars parked at the end of the driveway—a sedan that held Mr. Falkner and Mr. Horton, and a GMC Sierra pickup truck that held Mrs. Falkner. Doc. 109-17 at 4:09; Doc. 109-14 at 2; Doc. 109-16 at 2; Doc. 109-3 at 13. Deputy Cooper and Deputy Davis jumped over the gate and approached the vehicles on foot. *See* Doc. 109-17 at 4:13–4:26; *see* Doc. 109-19 at 4:11; Doc. 109-36 at 2.

Before Deputy Cooper reached the vehicles, and before Deputy Davis had crossed the gate, Mrs. Falkner screamed, "Fuck you" multiple times before accelerating down the driveway towards the house (and away from the deputies). Doc. 109-17 at 4:25–4:37; Doc. 109-2 at 37–38; *see* Doc. 109-14 at 2; Doc. 109-16 at 2; Doc. 109-27 at 4. Deputy Davis screamed "Hey! Stay there!" multiple times as Mrs. Falkner drove away. Doc. 109-19 at 4:19–4:29; *see* Doc. 109-17 at 4:35–4:38.

Deputy Cooper and Deputy Davis then spoke with Mr. Falkner and Mr.

Horton, who remained in their car. *See* Doc. 109-17 at 4:43. The deputies asked Mr. Falkner and Mr. Horton if there was a lock on the gate, Doc. 109-19 at 4:35, and if Mrs. Falkner could leave the property, *see id.* at 4:41–4:48; *id.* at 4:44 (Deputy Cooper: "How the fuck can she get out of here?"). If Mr. Falkner or Mr. Horton responded, it is inaudible. *See id.* at 4:43–4:55. Deputy Cooper later stated that Mr. Falkner was "shocked" and "wouldn't really talk[] to" the deputies. Doc. 109-27 at 4.

Deputy Davis recommended going after Mrs. Falkner on foot to "see what[ was] going on." Doc. 109-19 at 5:00–5:03. He also stated, "If she's got a gun, I'm getting my rifle." *Id.* at 5:10–5:12. Both deputies asked Mr. Falkner and Mr. Horton if Mrs. Falkner had a gun. *Id.* at 5:13–5:15. If Mr. Falkner and Mr. Horton answered, their response was again inaudible. *See id.* at 5:16.

Deputy Davis and Deputy Cooper retrieved their patrol rifles from their vehicles, *see id.* at 5:32–6:30, and around that time, Deputy Banks arrived at the Falkers' driveway and retrieved his rifle, Doc. 109-15 at 2; Doc. 109-14 at 2; Doc. 109-16 at 2; Doc. 109-3 at 16; Doc. 109-21 at 00:40–00:42. Deputy Cooper and Deputy Banks carried AR-15 rifles. *See* Doc. 109-3 at 10; Doc. 109-4 at 48; Doc. 109-6 at 25, 55. Deputy Davis carried a TX-15, an "upgraded rifle type," because he was on the "tactical unit," which is Shelby County's version of a SWAT unit. Doc. 109-7 at 67. Each of the deputies' rifles took a different type of ammunition. *See*

4

Doc. 109-23 at 11.

The deputies later testified that they decided to retrieve their patrol rifles because it was possible that Mrs. Falkner had a weapon, *see* Doc. 109-14 at 2; Doc. 109-3 at 14–15; Doc. 109-16 at 2, and because of the number of "unknown" circumstances before them, such as (1) Mrs. Falkner's emotional state and location, (2) the terrain, and (3) the deputies' lack of familiarity with the property, *see, e.g.*, Doc. 109-2 at 33, 39, 41, 44, 46, 50; Doc. 109-4 at 30.

Deputy Davis specifically explained that he conducted a "terrain analysis" and observed that the driveway leading to the house "was long and open" and "was bordered by rough terrain, brush, and dense vegetation." Doc. 109-16 at 2; *see* Doc. 109-2 at 43; Doc. 109-28 at 5. He testified that that the deputies did not "know what type of weapon . . . [Mrs. Falkner] potentially had," and that he believed his patrol rifle would better protect the deputies if she "started shooting at [them] . . . from a lot further away," Doc. 109-2 at 43–44. Deputy Banks later justified the deputies' decision to carry the rifles because "it's better to have and not need than not have." Doc. 109-4 at 37.

While the deputies were retrieving their rifles, the dash camera shows Mr. Falkner or Mr. Horton examining the lock on the gate. Doc. 109-17 at 5:52–6:14. At some point, Mr. Falkner told Deputy Cooper and Deputy Davis that he wanted to call someone to cut the lock so that he could leave, Doc. 109-16 at 2; Doc. 109-2 at

40, but Deputy Davis told Mr. Falkner that he was not "going anywhere" and made him stay on the premises, Doc. 109-16 at 2; Doc. 109-2 at 40; Doc. 109-28 at 11–12. Deputy Davis later testified that he was positioning himself in between Mr. Falkner and Mrs. Falkner "to make sure that th[eir] investigation [wa]s safe." Doc. 109-2 at 55. Deputy Banks later justified the deputies' decision to keep Mr. Falkner on the premises by stating that they needed to complete their domestic violence investigation, but he conceded that Mr. Falkner may have been able to leave the scene if the officers had let him, Doc. 109-4 at 25, 27–28.

### 2. The Deputies Walk In The Direction of Mrs. Falkner

The deputies began walking down the driveway in search of Mrs. Falkner, *see* Doc. 109-19 at 6:34–7:05; Doc. 109-17 at 6:44–7:18, because they could not get their patrol cars through the locked gate, *see* Doc. 109-4 at 39. All three deputies later justified their decision to walk down the driveway because they believed that they needed to complete their domestic violence investigation by speaking with both parties, Doc. 109-15 at 2; Doc. 109-14 at 2; Doc. 109-16 at 2; Doc. 109-2 at 31, 41, 45; Doc. 109-3 at 15; Doc. 109-4 at 24, although there was no "clock ticking" that required them to speak with Mrs. Falkner immediately, Doc. 109-2 at 45–46; *see* Doc. 109-4 at 38.

Deputy Davis testified that he believed there were exigent circumstances that required them to walk after Mrs. Falkner because of Mr. Falkner's detention at the

end of the driveway. Doc. 109-2 at 55. Deputy Banks testified that he did not believe exigent circumstances existed, but he believed that "a domestic investigation report had to be completed," and his "practice . . . is to get the information while" he is on the scene, Doc. 109-4 at 25, 27, 31.

The deputies walked down the driveway "on line," meaning they walked "abreast, side-by-side" with no one in the lead. Doc. 109-2 at 56, 60; *see* Doc. 109-3 at 17. Because all three deputies were of equal rank, no one deputy was in charge of the others. Doc. 109-2 at 67; Doc. 109-3 at 14–15; Doc. 109-4 at 32.

The deputies made various tactical decisions while walking. For instance, the driveway was dark, Doc. 109-16 at 2, and the deputies decided to walk in the dark to avoid being seen, Doc. 109-4 at 46, 52. Deputy Davis even turned off the light on his body microphone so that Mrs. Falkner would not be able to see them as they approached. *See* Doc. 109-16 at 3; Doc. 109-2 at 28, 57; Doc. 109-28 at 6.

The deputies also discussed the manner in which they would approach the Falkners' residence. Deputy Davis suggested that the deputies walk in the tree line so that they would have cover if Mrs. Falkner decided to shoot at them. Doc. 109-16 at 3; Doc. 109-2 at 29, 57. Deputy Banks suggested that they stay on the driveway "to see where the vehicle was going" and stated that if Mrs. Falkner drove at them with the truck, "it's justified." Doc. 109-4 at 41; *see* Doc. 109-2 at 29; Doc. 109-26 at 3. The deputies understood that phrase to indicate that they would be justified in

using deadly force if Mrs. Falkner used her truck as a weapon. *See* Doc. 109-2 at 29; Doc. 109-4 at 41.

Although the deputies made a few tactical decisions, they did not "have a plan." Doc. 109-3 at 19; Doc. 109-4 at 32. For instance, Deputy Cooper testified that they "played it by ear," and that their plan was, "Don't die." Doc. 109-3 at 19.

### 3. The Deputies Locate Mrs. Falkner

While the deputies were walking, they saw Mrs. Falkner "erratic[ally]" driving around the house and "turning [her] headlights on and off." Doc. 109-16 at 2–3; *see* Doc. 109-2 at 41, 59–60; *see* Doc. 109-4 at 41; *see* Doc. 109-3 at 16. The deputies testified that they eventually saw Mrs. Falkner's truck turn to the right of the driveway. Doc. 109-14 at 2; Doc. 109-15 at 2; Doc. 109-4 at 45.

Before they reached the Falkners' house, the deputies "came around a bend where a hill/embankment blocked [their] view of an open field to [their] right." Doc. 83-3 at 3; Doc. 94-1 at 4. The embankment was between eight and ten feet high and is so steep that it was described as "almost like a wall to a room." Doc. 109-5 at 45. The following pictures show the embankment, the driveway, and the field in the light of day:



Doc. 91-3 at 2.



Doc. 109-37.

Then the deputies saw Mrs. Falkner's truck parked to the right of the driveway. Doc. 109-16 at 3. Deputy Davis estimated that Mrs. Falkner's truck was between twenty-five and thirty yards away from the deputies when they discovered it. Doc. 109-2 at 27. Deputy Banks initially stated in his interview with the Shelby County Sheriff's Office Criminal Investigations Division that the truck was between twenty and thirty feet away from the deputies, Doc. 109-26 at 7, but later testified at his deposition that it was twenty-five or thirty yards away from them, Doc. 109-4 at 47.

The deputies described additional information about their discovery of the truck differently. Deputy Cooper stated that the deputies saw Mrs. Falkner "backing in" to a location to the right of the driveway, Doc. 109-25 at 5, and that "[w]hen [they] got in the area where [they] saw the truck backed in, [they] saw fresh tire tracks." Doc. 109-14 at 2; *see* Doc. 109-3 at 16. According to Deputy Cooper, the deputies found Mrs. Falkner's truck less than three minutes after they saw Mrs. Falkner put it in reverse. *See* Doc. 109-25 at 6.

Deputy Banks stated that they "had a general sense that" Mrs. Falkner was "off to the right somewhere" but that they "just didn't know where because the driveway is so long." Doc. 109-24 at 12. Deputy Banks testified that they "could see a general direction of where [the truck] was going" but they "could never actually

see the vehicle until [they] got up on it." Doc. 109-4 at 42. Deputy Banks testified

that he "assumed [Mrs. Falker] was to the right just based off the last time [they]

saw the headlights" but that they "didn't know where she was until [they] were up

on the vehicle." *Id.* at 46–47.

Deputy Davis stated that he saw the truck because of a "glimmer of light on

the windshield" and that the truck "had all lights off." Doc. 109-16 at 3. He testified

that he was "surprised" by Mrs. Falkner's position because he "didn't know that she

was back [t]here." Doc. 109-2 at 69–72, 87.

Deputy Davis used his rifle flashlight to illuminate the truck, and the deputies

saw Mrs. Falkner sitting in the driver's seat with the truck turned off. *See* Doc. 109-

15 at 2; Doc. 109-26 at 3; Doc. 109-14 at 2; Doc. 109-16 at 3; Doc. 109-2 at 28. All

three deputies then shined their rifle-mounted lights at the truck and yelled various

commands, such as "get out of the vehicle" or "show me your hands," at Mrs.

Falkner. Doc. 109-2 at 56, 65, 67–68, 70–72; Doc. 109-14 at 2; Doc. 109-16 at 3;

Doc. 109-3 at 16, 21–22; Doc. 109-4 at 19, 48.

Deputy Davis and Deputy Cooper testified that when they were shining their

rifle lights on Mrs. Falkner, their guns were "to [their] shoulder[s] [at] the ready."

Doc. 109-2 at 67; *see* Doc. 109-3 at 21. Deputy Banks conceded that giving the

commands of "show me your hands" and "get out of the vehicle" may be confusing

and inconsistent, and that "[i]nconsistent commands can be a problem." Doc. 109-4

at 19, 33.

None of the commands indicated that the deputies were about to use deadly force. *See* Doc. 109-2 at 85; Doc. 109-4 at 53. The deputies later stated that it was not "feasible" to give Mrs. Falkner such a warning in the light of later events described below. Doc. 109-2 at 85; *see* Doc. 109-4 at 53.

### 4. The Shooting

According to the deputies, Mrs. Falkner did not listen to their commands and instead turned on her truck, put it in drive, and drove rapidly towards them. Doc. 109-14 at 2; Doc. 109-15 at 2; Doc. 109-16 at 3; Doc. 109-2 at 75–76; Doc. 109-3 at 22. Deputy Cooper stated that Mrs. Falkner ignited the truck "[a]s soon as" the deputies shined a light on her. Doc. 109-27 at 6. Deputy Davis estimated that two or three seconds elapsed between the deputies' commands and Mrs. Falkner's acceleration towards them. *See* Doc. 109-2 at 73. Deputy Banks estimated that between five and ten seconds elapsed. Doc. 109-24 at 5; Doc. 109-4 at 47, 50.

The deputies also reported that Mrs. Falkner's truck was moving quickly in their direction, although none of them could estimate how fast it was moving. *See* Doc. 109-2 at 76–77; Doc. 109-4 at 51; Doc. 109-27 at 7. Deputy Banks testified that the truck was moving "at a high speed," and that it was faster than a jog. Doc. 109-4 at 49, 51. Deputy Banks testified that once the truck engine was ignited, the truck was on top of them "instantly." Doc. 109-26 at 7. Deputy Cooper stated that

the truck was moving "[p]retty fast." Doc. 109-27 at 7.

Deputy Davis and Deputy Banks stated they ran to the right up the embankment to get out of the truck's path. *See* Doc. 109-14 at 2; Doc. 109-16 at 3. Deputy Cooper testified that he initially moved to the left but realized that there was an open field in that direction. Doc. 109-3 at 16; Doc. 109-25 at 7; Doc. 109-27 at 6–7. He testified that when he "realized the vehicle was still coming at [him]," he "[f]ired several shots at the [truck]" while he "[t]ried to get out of the way." Doc. 109-3 at 16; *see id.* at 23–24; *see* Doc. 109-14 at 2.

The deputies stated that the truck turned to follow them in the direction in which they ran. *See* Doc. 109-26 at 4; Doc. 109-27 at 6; Doc. 109-28 at 8. They also stated that they thought the truck was going to run them over, and that they were in fear for their lives. *See, e.g.*, Doc. 109-28 at 8, 10; Doc. 109-26 at 5; Doc. 109-25 at 9–10.

Deputy Cooper testified that Mrs. Falkner hit him with the truck, "knocked [him] to the ground and ran over [his] right leg." Doc. 109-3 at 16. He described the force of the impact when the truck hit him: "It wasn't no hard, like, football hit like you're playing football[,]" but "[i]t was enough to get me off my feet." Doc. 109-27 at 9.

Deputy Cooper also stated that Mrs. Falkner's foot "was on the gas when she hit [him]." *Id.* at 8. He stated that his "back was against the . . . incline" of the

embankment and that he "could see . . . the tire between [his] legs . . . turning towards [him]." Doc. 109-3 at 16; *see id.* at 25. Deputy Cooper testified that he fired shots into the front of Mrs. Falkner's truck when he was underneath it and that "after a while the car rolled back and stopped on top of [his] right leg." *Id.* at 16; *see* Doc. 109-14 at 2. He stated that when the truck ran over his leg, "it didn't hurt," and he "just felt . . . a lot of pressure." Doc. 109-27 at 10. He described the pain as "like a cramp." *Id*.

Deputy Cooper "fired more shots into [Mrs. Falkner's truck] until [it] backed off [his] leg." Doc. 109-14 at 2; *see* Doc. 109-3 at 16. At that time, Deputy Cooper was able to walk to a safe area, where he "noticed . . . heavy bleeding coming from [his] left arm." Doc. 109-14 at 2; *see* Doc. 109-3 at 16–17. He later stated that he did not know how many rounds he fired at Mrs. Falkner. Doc. 109-27 at 10.

Deputy Banks saw Mrs. Falkner "turn[] in the direction that [the deputies] were running." Doc. 109-15 at 2; *see* Doc. 109-4 at 49. He stated that he "heard Deputy Cooper screaming" when the truck pinned him against the embankment. Doc. 109-15 at 2; *see* Doc. 109-24 at 6. Deputy Banks then "discharged [his] duty rifle several times into the cab of the truck," Doc. 109-15 at 2, "stopped firing for a second," and continued firing when he saw that "the truck still seemed to . . . be accelerating" with Deputy Cooper underneath it. Doc. 109-15 at 2; *see* Doc. 109-4 at 56 ("[E]ven after impacting Deputy Cooper, the vehicle was still accelerating

rapidly."). Deputy Banks testified that he "shot until the threat stopped," which was when the truck "stopped accelerating." Doc. 109-4 at 58. Deputy Banks testified that Mrs. Falkner's truck "didn't stop moving until after it struck Deputy Cooper and hit the embankment." *Id.* at 29.

Deputy Davis stated that the truck almost hit him and missed him by only "a couple of feet," Doc. 109-23 at 9; Doc. 109-28 at 8–9, and that he "scurr[ied] up" the embankment to avoid being hit, Doc. 109-28 at 9. Deputy Davis reported that he saw Deputy Cooper pinned underneath the truck and that "the truck engine [was] still being revved up." Doc. 109-16 at 3; *see* Doc. 109-2 at 91; Doc. 109-28 at 9, 11 (stating that the truck was "revving up" when it "came in on" the deputies and "[w]hen it was on" Deputy Cooper). He stated that he "continued to fire [his] weapon until the truck backed off and Deputy Cooper was able to get away." Doc. 109-16 at 3; *see* Doc. 109-2 at 90; Doc. 109-28 at 9–10.

Deputy Davis stated that he could "not recall the exact time [he] first fired" or "the number of rounds that [he] fired." Doc. 109-16 at 3. He reported that he remembered thinking only that he was "about to be run over and turned into a rag doll." *Id.* at 3 (cleaned up); *see* Doc. 109-2 at 76. He stated that when the deputies opened fire on Mrs. Falkner, "she was an imminent threat in [his] perception to killing [them]." Doc. 109-2 at 51, 97. He testified that all of the events he described were "rapidly evolving at the same time." *Id.* at 87.

After Mrs. Falkner's truck stopped moving and Deputy Cooper was away from it, the deputies applied a tourniquet to Deputy Cooper's left arm because of the blood on his sleeve. *See* Doc. 109-14 at 2; Doc. 109-16 at 3; Doc. 109-2 at 92. They then checked on Mrs. Falkner, Doc. 109-16 at 3; Doc. 109-2 at 91, who did not have a pulse and had no signs of life, *see* Doc. 109-16 at 3; Doc. 109-26 at 6; Doc. 109-28 at 10. An investigator later testified that Mrs. Falkner's remains were gruesome— "the top of her head had been shot off" and "her brain had been shot out of her head." Doc. 109-5 at 52.

To illustrate the scene of the shooting, the parties offered various photographs.

The following image shows the tire tracks present on the scene:



Doc. 91-4 at 2. And the next picture shows the final position of Mrs. Falkner's truck

on the embankment:



Doc. 82-14 at 2.

### 5. The Arrival Of Backup and Rescue Teams

The backup police and rescue teams arrived at the front gate shortly after the

shooting occurred. *See* Doc. 109-19 at 18:32–19:06. Mr. Falkner and Mr. Horton

remained by the gate at the end of the driveway when the backup police and rescue

team arrived. *See id.*; Doc. 109-24 at 10–11.

Deputy Cooper was transported by ambulance and airlifted to University of Alabama Birmingham hospital for his injuries, Doc. 109-14 at 2; Doc. 109-3 at 17, where he was discharged after a couple of hours, *see* Doc. 109-7 at 77. Although no procedures were performed on him at the time, he later had a surgery to drain fluid from his leg because his "skin was detached from [his] muscle." Doc. 109-3 at 25. He testified that the blood on his arm was caused by shrapnel from bullet fragments that hit his head and arm. *See* Doc. 109-27 at 10–11; Doc. 109-3 at 26. He did not have any broken bones from the incident. Doc. 109-3 at 26.

The deputies testified that they did not see Mrs. Falkner with a weapon before the shooting occurred. Doc. 109-2 at 40; Doc. 109-3 at 34; Doc. 109-4 at 18. They also testified that no one ever conducted a "round count" with them, and they were unsure how many rounds they had each fired. Doc. 109-2 at 79–80. A round count involves calculating how many rounds were fired by (1) determining how many rounds were in the deputies' magazines, (2) determining how many rounds were left in the magazines after the shooting occurred, and (3) subtracting. *See* Doc. 109-5 at 9. Investigators conduct round counts "to [ac]count for the rounds that are discharged," *id.*; *see* Doc. 109-7 at 34, and to "us[e] as a guideline to try to make sure that [they are] not missing something," Doc. 109-8 at 19–20.

Individuals from the Shelby County Major Crimes Task Force ("the Task

Force"), a unit of Shelby County that investigates officer-involved shootings, Doc. 109-5 at 4, arrived to process the scene after the shooting occurred. *See id.* at 52–53. Members of the Task Force who were present included Sergeant Brad Jordan, Detective Mike Bellanca, Detective Sean Boczar, Sergeant Brian Krukowski, Investigator Dustin Gray, then-Corporal Kevin Summerall, and Lieutenant Daniel Goodwin. *Id.*; *see* Doc. 109-6 at 14, 16, 37. The Shelby County District Attorney and the former-Captain of the Shelby County Sheriff's Office Criminal Investigations Division Jason Myrick were also present. Doc. 109-5 at 53–54; *see* Doc. 109-7 at 4–5.

### B. Evidence Collected From The Scene

Lieutenant Goodwin is "the lead crime scene investigator for the . . . Task Force." Doc. 109-6 at 9. In that position, Lieutenant Goodwin "collect[s,] . . . preserve[s,] and document[s] physical evidence," and he interprets that evidence when asked. *Id.* On the evening of January 4, 2021, Lieutenant Goodwin and Corporal Summerall processed the scene where the deputies' shooting occurred. *See id.* at 14–15.

Lieutenant Goodwin and Corporal Summeral began by "taking photographs to preserve the scene as it" then existed. *Id.* at 14–15, 22. They ran a FARO scan, which provides "[a]n accurate sketch" of the scene. *Id.* at 22–23, 58; *see* Doc. 109-5 at 15 (explaining that a FARO scan is a "3D imaging software that [is] use[d] to

recreate the crime scene"). They marked shell casings located on the scene with "tent markers." Doc. 109-6 at 19–20, 22. And they collected physical evidence, such as shell casings, rifles, and clothing. *See id.* at 23. Lieutenant Goodwin testified that although he did not remember what gear the truck was in when he took photographs of it, he did not "recall it being . . . in reverse." *Id.* at 28.

Lieutenant Goodwin examined the tire tracks at the scene. He stated that he was told that Mrs. Falkner's truck had been backed into a "cul-de-sac type clearing in the trees" and that he saw tire tracks coming from that location. *Id.* at 15. He did not see cigarettes or cellophane wrappers on the ground at the scene and testified that if he had seen such evidence, he would have taken a photo of it. *Id.* at 15–17; *see id.* at 37.

Lieutenant Goodwin testified that the tire tracks that began where he was informed the truck was initially parked indicated "[t]hat a vehicle c[a]me from back in the back, th[e] little cul-de-sac looking area, and made a wide sweeping turn toward the embankment." *Id.* at 17. But he testified that other vehicles had been driven around the scene before he arrived and that the Task Force chose not to analyze the tire tracks—including which vehicle made them or whether they indicated that the vehicle was moving forwards or backwards. *See id.* at 15, 18–19. He testified that he had "[n]o clue" whether the tracks were actually made by Mrs. Falkner's truck. *Id.* at 18–19.

Lieutenant Goodwin collected sixty-three shell casings from the scene. *Id.* at 24. He testified that he did not know how many rounds the deputies shot, and that they "did the best [they] could to locate" all shell casings, but stated that "[w]ith the number[] of casings or bullets that were fired[,] it's almost impossible given the undergrowth and vegetation to find them all." *Id.* at 25. He did not conduct a round count because he believed that that responsibility belonged to Sergeant Jordan. *Id.* at 53.

Lieutenant Goodwin testified that he would "be very hesitant" to attempt to determine the positions of the officers when the shooting occurred based on the shell casings left on the ground at the scene "[b]ecause when shell casings land in brush and shrubs and everything else[,] they bounce, they deflect, they land anywhere other than where they're supposed to be." *Id.* at 25. Therefore, he did not attempt to make such a determination based on the shell casings in this case. *Id*. He stated that "[i]t's almost impossible in my opinion to determine where officers were based" on the location of shell casings. *Id.* at 36.

Lieutenant Goodwin went back to the Falkners' property the next morning, on January 5, 2021, and "rephotographed the scene in daytime." *Id.* at 37. Sergeant Phil Collins, Sergeant Jordan, Sergeant Krukowski, Detective Boczar, and Captain Myrick were also present the next day. *Id*.

After leaving the Falkners' residence, he obtained a search warrant for Mrs.

Falkner's vehicle "[t]o search for any physical evidence contained within the vehicle." *Id.* at 40. At that point, Mrs. Falkner's truck had been towed to Kirkland Wrecker Service. *Id.* at 41. Lieutenant Goodwin found a gun locked in the center console of the truck when he searched it on January 5, 2021. *Id.*

Lieutenant Goodwin also found bullet holes in the frame of the truck "[u]nderneath the driver's side fender well," *id.* at 47, and that the driver's side window had been shot so many times that "[i]t was missing." *Id.* at 28. He testified that he could have attempted to determine which rifle fired which round into the truck, but that the Task Force chose not to do so because "[t]here was a large number of bullet holes throughout the vehicle" and "[i]t would have been very problematic to do so." *Id.* at 39.

Lieutenant Goodwin pulled and interpreted the airbag module data recorded by the truck. *Id.* at 9. He testified that "side curtain airbags," not the frontal airbags, were deployed, *id.* at 70, and that the airbag module recorded that a "rear, side and frontal" event that caused the algorithm to enable airbag deployment, *id.* at 43–44; *see* Doc. 109-33 at 5.

Based on that data, Lieutenant Goodwin identified three possibilities for what could have triggered the airbag deployment: (1) the force of the truck hitting the embankment, (2) the force of "hitting a grown man," or (3) the impact of a bullet that "went through . . . where the airbag is housed in the steering wheel."  Doc. 109-

6 at 32, 44, 52, 69. Lieutenant Goodwin considered the last possibility only because he is "trained to consider all possibilities," *id.* at 58–59, did not base that hypothesis on any training or information he accessed relating to airbags, and testified that he was "not enough of an expert to answer the question of whether or not [a bullet hitting the airbag housing area] could have possibly made it blow." *Id.* at 44, 58–59. He testified that in his opinion, the truck's impact with the embankment "set the airbag off." *Id.* at 34. The Task Force did not hire a mechanic or other professional to determine the exact cause of deployment. *See id.* at 53, 60.

Lieutenant Goodwin stated that there were no bullet holes in the side curtain airbag, although there were bullets "that went through the . . . driver's side window and out the passenger side window." *Id.* at 25. But he testified that such evidence did not prove that any shots fired through the truck were necessarily fired before the airbag deployed because "airbags are like anything else, they move as the vehicle moves." *Id.* at 26. He also testified that "the bullets came from different directions" and that a bullet "would not have had to pass through the airbag itself to make impact with" Mrs. Falkner's head. *Id.* at 28. He conceded that it is also a "possibility" that the bullets were shot before the airbag deployed and agreed that if a bullet struck Mrs. Falkner in the head, "the airbag would cover that area." *Id.* at 26–27.

Lieutenant Goodwin also downloaded other data recorded by the truck 2.5 seconds prior to the airbag deployment. *Id.* at 43, 45. The program that processes

that data generated the following chart to illustrate the data recorded:



**Pre-Crash Data -1 to -.5 sec (Event Record 1)**

| Times (sec) | Cruise Control Active | Cruise Control Resume Switch Active | Cruise Control Set Switch Active | Engine Torque (lb-ft [N-m] | Reduced Engine Power Mode Indicator |
|---|---|---|---|---|---|
| -1.0 | Data Not Available | Data Not Available | Data Not Available | 114 [ 154] | Off |
| -0.5 | Data Not Available | Data Not Available | Data Not Available | 111 [ 150] | Off |

**Pre-Crash Data -2.5 to -.5 sec (Event Record 1)**

| Times (sec) | Accelerator Pedal Position (percent) | Brake Switch Circuit State | Engine Speed | Throttle Position (%) | Vehicle Speed (MPH [km/h]) |
|---|---|---|---|---|---|
| -2.5 | 0 | Off | 512 | 12 | 0 [ 0] |
| -2.0 | 66 | Off | 1152 | 60 | 1 [ 2] |
| -1.5 | 69 | Off | 1280 | 28 | 4 [ 6] |
| -1.0 | 71 | Off | 1280 | 28 | 4 [ 7] |
| -0.5 | 74 | Off | 1280 | 28 | 4 [ 7] |

Doc. 109-33 at 9.

Lieutenant Goodwin testified that the data reflects that the truck was moving

at a speed of zero miles per hour at 2.5 seconds before the airbag deployed and a

speed of four miles per hour at the time that it deployed. Doc. 109-6 at 45, 49. He

testified that this data may not be completely accurate because "if all four tires [were]

not spinning [at] the exact same time," the module may have incorrectly listed the

miles per hour that the truck was moving. *Id.* at 71–72. He stated that one would

"just have to consider the totality of the circumstances when trying to determine

whether or not the speed [was] accurate." *Id.* at 72. He also stated that the data did

not indicate whether the truck was moving forward or backwards at the time it was recorded, *id.*, and that nothing in the data confirmed or dispelled the deputies' assertion that the truck moved left or right to track their movements, *id.* at 66, 72.

The data also indicated that the truck's throttle went "from 12 percent at negative two and a half seconds to 60 percent [at negative two seconds] to 28 percent" at negative 1.5 seconds. *Id.* at 50; *see* Doc. 109-33 at 9. It also indicated that the accelerator pedal was a "zero" 2.5 seconds before the airbags deployed, and it jumped to sixty-six percent two seconds before. Doc. 109-6 at 51; *see* Doc. 109-33 at 9. He stated that such metrics could "[p]ossibly" be consistent with someone starting a truck. Doc. 109-6 at 51.

Lieutenant Goodwin limited the use of the data pulled from Mrs. Falkner's truck. He testified that "without knowing at what point the airbag enabled" he could not "use [the data] as a basis to determine the entire sequence of events." *Id.* at 48. He testified that the data "doesn't really tell . . . anything because it could be any two-and-a-half-second time period between where the car was and where it ended up." *Id.* at 49.

### C. The Chief Alabama Medical Examiner's Autopsy Report and Testimony

Dr. Edward Reedy is the Chief Medical Examiner for the Alabama Department of Forensic Sciences. Doc. 109-11 at 4. Dr. Reedy conducted the autopsy examination of Mrs. Falkner's body on January 6, 2021. *Id.* at 8.

Dr. Reedy testified that that Mrs. Falkner had at least forty-four "indeterminant range gunshot entrance wounds," *id.* at 22, but he identified two types of shots that could have caused Mrs. Falkner's death. *See id.* at 10, 18–19. One option is a "bullet [that] went through the bone in the front of her face" and "exited her head on the right side," which would have been immediately fatal. *Id.* at 10–11. The other option is five bullets "that entered [Mrs. Falkner's] lower back" and exited "out [of] her chest" that would have caused Mrs. Falkner to die within "[t]wo or three minutes," *id.* at 18.

Dr. Reedy testified that Mrs. Falkner's body was found "slumped over the center armrest with her right arm resting on the armrest and her head resting on her right arm." *Id.* at 14. He testified that he had "no way of determining what position M[r]s. Falkner was in when she was shot any of the times [that] she was shot." *Id.* at 32. And he testified that he had "no evidence that" told him "what order the shots were inflicted." *Id.* at 32–34. For those reasons, Dr. Reedy listed the cause of death as "multiple gunshot wounds." *Id.* at 32; *see id.* at 7. But Dr. Reedy testified that at least thirty-three of the entrance wounds, including the five bullets in her back, entered her body after she had "slumped over." *Id.* at 19–20, 22–23.

Dr. Reedy testified that he could not determine whether the bullet that struck Mrs. Falkner in the head hit her before she "slumped over." *Id.* at 20. He testified that the bullet to the head was "consistent with [Mrs. Falkner] being shot in the left

. . . and slumping over to the right." *Id.* at 16. But he also testified that she could have moved into that position "in an effort to avoid being shot," *id.* at 20, and that "she may have turned her head and raised . . . it slightly, and the [bullet in the head] could have come through the [driver's side] door." *Id*. He testified that if she was in the "slumped over" position while she was alive, it is unlikely that she could have controlled her truck. *Id.* at 43. And he testified that it was "less likely" that remnants from Mrs. Falkner's skull that landed on the passenger floorboard would have ended up there if she was slumped over before she was shot, but he could not rule it out. *Id.* at 21.

Dr. Reedy testified that the investigators could have conducted an analysis to determine which rifle fired the bullets that were recovered from Mrs. Falkner's body, but that such an analysis was not performed in this case. *Id.* at 28. He testified that the Birmingham Laboratory Services "canceled" that analysis because "Daniel Goodwin . . . notified the laboratory that no analyses were needed." *Id.* at 30 (cleaned up).

Dr. Reedy also testified about the presence of drugs and alcohol in Mrs. Falkner's body, although he could not testify about their effects on Mrs. Falkner. *See id.* at 25–26, 37–38, 40–41. He testified that Mrs. Falkner's blood alcohol content was approximately "one and a half times the legal limit to drive" and that she had amphetamines in her system. *Id.* at 37–38, 42; *see* Doc. 80-20 at 2–3 (toxicology

report). He testified that the toxicology report was "irrelevant to the cause of death." Doc. 109-11 at 36.

### D. The Investigations

Two investigations were initiated in response to the shooting: (1) an investigation by the Task Force to provide a report and recommendation to the Shelby County District Attorney's office on whether the deputies' use of deadly force was justified ("the Task Force Investigation"), *see* Doc. 109-5 at 7, and (2) an administrative investigation to determine whether the deputies complied with Shelby County Sheriff's office policies and propose changes to those policies ("the Administrative Investigation"), *see* Doc. 109-12 at 13, 15; *see* Doc. 109-7 at 8, 69.

### 1. The Task Force Investigation

Sergeant Brad Jordan is "an investigator with the Pelham Police Department" and is a part of the Task Force. *See* Doc. 109-5 at 4. Sergeant Jordan was in charge of the Task Force Investigation and presented the evidence he collected to a grand jury. *See id.* at 5, 7.

Sergeant Jordan arrived at the Falkners' residence on January 4, 2021, between 7:30 p.m. and 8:00 p.m. alongside other police respondents. *Id.* at 6. When Sergeant Jordan returned to the Falkners' residence on the morning of January 5, 2021, he testified that officers from the Shelby County Sheriff's Department were present at the scene without a Task Force representative, which caused him concern

because it could give a negative "appearance." *Id.* at 5. He spoke with an officer on the scene, and the Shelby County Sheriff's officers left shortly after he arrived. *Id.* at 6.

In creating his report, Sergeant Jordan considered a variety of evidence. He considered statements he says were made by Mr. Horton and Mr. Falkner to other members of the Task Force on January 4, 2021. *See id.* at 23–25. He stated that he could not "put [his] hands" on those statements and did not recall listening to them. *Id.* at 24–25. He also testified that the statements were never "added to the case file" and acknowledged that he "should have ordered the issue, but . . . took [his] foot off the gas" when the grand jury declined to indict the deputies. *Id.* at 25.

Sergeant Jordan also considered conversations that he personally had with Mr. Falkner in which Mr. Falkner stated that Mrs. Falkner "lured" him to the residence so that she could kill him. *See id.* at 74. Sergeant Jordan testified that he did not have any documentation of this conversation. *Id*. Mr. Horton and Mr. Falkner have since died. *See id.* at 24.

Sergeant Jordan also considered the presence of cigarette buds and a cellophane wrapper that he personally observed on the ground on January 5, 2021, including "one that looked relatively fresh." *Id.* at 60. Sergeant Jordan relied on this evidence to confirm where he believed the car was located before the deputies approached it and formulate his belief that Mr. Falkner parked and smoked a

cigarette "hoping the[] [deputies] would walk past" her. *Id*. He acknowledged that this theory was his own "speculati[on]." *Id*.

Sergeant Jordan considered photographs of evidence at the scene. He testified that "[o]ne of the crime scene photos indicated that the . . . gear shifter was in neutral," and that he believed that Mrs. Falkner stopped when she hit the embankment "and was possibly putting the vehicle in reverse." *Id*. at 77. He stated that the position of the gear shift happened either "as a result of [the truck] striking the embankment or [Mrs. Falkner] was physically taking [the truck] out of drive." *Id*.

Sergeant Jordan considered the gun found in Mrs. Falkner's truck on January 5, 2021. *Id*. at 62–63. He testified that he was not sure if Mrs. Falkner could have accessed the gun on the evening of January 4, 2021. *Id*. at 63–64.

Sergeant Jordan considered the data recorded by Mrs. Falkner's truck. *See id*. at 29. He testified that the data indicated that the truck was initially moving zero miles an hour but accelerated to four miles per hour right before the airbag deployed. *Id*. at 30. He testified that he believed the data indicated an "initial[] . . . engine rev" but that the vehicle "lo[st] traction and then . . . die[d] off." *Id*. at 31. He conceded that a speed of "four and a half miles an hour" is "consistent with a car that's just in drive and rolling forward." *Id*.

Sergeant Jordan testified at his deposition about several deficiencies in the

physical evidence collected from the scene. For instance, he testified that about the lack of a round count in the investigation and testified that conducting a round count was "an evidence technician" question for Lieutenant Goodwin. *Id.* at 9–10. He conceded that he did not ask Lieutenant Goodwin for the round count because it was "not an important matter," "the car was riddled" with bullets, he could "see that a lot of rounds were fired," and it "was not [his] priority" to "get an exact number." *Id.* at 10.

Sergeant Jordan also testified about the Task Force's decision not to analyze what caused the airbag to deploy in Mrs. Falkner's truck. *See id.* at 32. He testified that the general "belief was that one of the rounds hit a sensor causing the airbag to deploy" but conceded that no one checked to see if a bullet actually hit the sensor. *Id*.

As part of his investigation, Sergeant Jordan also interviewed the deputies separately on January 8, 2021. Docs. 109-23–109-25; *see* Doc. 109-5 at 13–14. He testified that the interviews were not "aggressive" because he believed that the deputies would "provide the substance of their actions, and physical evidence dictate[d] the rest." Doc. 109-5 at 74. He testified that he had already concluded that the deputies' use of deadly force was justified by the time he interviewed them, and that the deputies' testimony was "filler." *Id.* at 61–62.

Sergeant Jordan spent much of his interview with the deputies recounting either the "series of issues that were set in motion prior to [the deputies] arrival" (which were unknown to the deputies at the time of the shooting), Doc. 109-25 at 3–5; Doc. 109-24 at 8–9; Doc. 109-25 at 3–5, or speculating as to Mrs. Falkner's intentions and actions, *see* Doc. 109-23 at 7, 10, 13; Doc. 109-24 at 4, 7; Doc. 109-25 at 8; *see also* Doc. 109-5 at 78 (conceding that he was "speculating out loud" in his interview with one of the deputies).

He also frequently asked leading questions. For instance, instead of asking the deputies where they believed the truck was parked on a photograph of the scene in the interviews, Sergeant Jordan used a photo that had a patrol car parked where he believed Mrs. Falkner's truck would have been parked based on the physical evidence and asked the deputies to describe their discovery of it. *See* Doc. 109-24 at 3–4; Doc. 109-25 at 6; Doc. 109-5 at 34–35. Sergeant Jordan justified this investigative tactic because he believed that the Task Force had "established where the car was positioned generally." Doc. 109-5 at 33–35. He testified that "at that point [he] knew better where the [truck] was located than [the deputies] did because [he] actually tracked it" from on the tire tracks on scene. *Id.* at 35.

Sergeant Jordan also acknowledged in the interviews—without asking the deputies questions about it—that there was a "one off" shell casing that was located away from where the others were found. Doc. 109-23 at 9 ("Of course, there's

always a one-off over here and you're always going to have one that just makes no sense, but there's [a shell casing] way over here where it got caught up in somebody's clothes or kicked or spun or whatever."); Doc. 109-24 at 9 ("There's always a one-off and that's sitting over here, [and] it got caught up in somebody's clothing or something."); *see* Doc. 109-5 at 72. He did not ask the deputies if any of them had fired their weapon in that location, *see generally* Docs. 109-23–109-25, and simply testified that he was "surprised" that more shell casings were not scattered away from the others, Doc. 109-5 at 72.

After the interviews, Sergeant Jordan met the deputies at the Falkners' property and recorded on a body camera each deputies' separate account of the events that unfolded on January 4, 2021. *See id.* at 17. He testified that the footage was lost during the Pelham Police Department's transition to a new supplier for body-camera technology, *see id.* at 21–22, and that although he "ha[s] done everything in [his] power to get th[e] video back," he was unable to locate it for purposes of this litigation, *id.* at 21.

Sergeant Jordan concluded his investigation around March 24, 2021. *Id.* at 22–23. After he concluded his investigation, Sergeant Jordan created a report highlighting his findings. *See generally* Doc. 109-13. In relevant part, the report stated that Mrs. Falkner's truck was "approximately [twenty-five] yards away" from the deputies when they found it, *id.* at 5, which he testified was his own "estimate

[based] on the reporting." Doc. 109-5 at 37.

The report also stated that when the deputies began giving Mrs. Falkner commands, the truck "lurched forward, spinning tires in the grassy soil, and began accelerating towards the three deputies" before they shot at it. Doc. 109-13 at 5. The report does not mention the data pulled from the truck, the truck's airbag deployment, or the truck's contact with the embankment. *See id.* at 5–6.

Sergeant Jordan later testified that the deputies did not get closer to the truck than "five to seven feet," Doc. 109-5 at 48, and that he estimated that the truck was eighty-eight to 100 feet away from the embankment based on the "trajectory of the tire tracks from the [truck's] starting position," *id.* at 33. He testified that he believed Mrs. Falkner's truck was in motion, hit the embankment, and then rolled backwards, which he believes corresponds with what the data reports on the speed of the vehicle two seconds before the airbags deployed. *Id.* at 36. He also testified that he could "see the [truck] transferring from right to left" and "hear an acceleration in a truck" on the footage from Deputy Cooper's dash camera. *Id.* at 36, 83.

### 2. The Administrative Investigation

In his role as captain division commander for the Criminal Investigations Division of the Shelby County Sheriff's Office, Doc. 109-7 at 5, Captain Myrick was tasked with conducting the Administrative Investigation to "review the [January 4, 2021,] incident objectively and provide a report to show any policy deviations or

issues that occurred." *Id.* The Administrative Investigation "serve[d] as both an internal review of policies and procedures, as[ ]well[ ]as an assessment of common practices employed by law enforcement." Doc. 109-12 at 13; *see* Doc. 109-7 at 8. Captain Myrick also evaluated "gaps" in the policy and recommended changes to "make the policy better." Doc. 109-7 at 8, 69; *see, e.g.*, Doc. 109-12 at 15.

Captain Myrick began his investigation on January 13, 2021. *See* Doc. 109-12 at 9. As part of his investigation, interviewed each deputy individually, *see* Doc. 109-7 at 13; Docs. 109-26–109-28, considered evidence collected from the deputies' dash cameras and body microphones, *see, e.g.*, Doc. 109-12 at 9–11, and considered information provided by Sergeant Jordan, *see, e.g.*, *id.* at 8–9,11; Doc. 109-7 at 71, 84, 86. Captain Myrick testified that the Task Force Investigation and the Administrative Investigation ran "independently" but that he "pulled" data from the Task Force's investigation and "added" it to his own investigation. Doc. 109-7 at 6–7; *see id.* at 25, 28, 31, 66–67, 86; Doc. 109-12 at 8. For instance, Captain Myrick received the footage of the deputies' walk around the scene of the shooting with Sergeant Jordan. Doc. 109-7 at 23, 28, 30.

Captain Myrick closed his administrative investigation on January 21, 2021, Doc. 109-12 at 39, and created a report to document his findings and recommendations for Shelby County Sheriff's Office policy revisions, *see generally id*. In that report, Captain Myrick detailed his findings, recommended certain policy

changes based on the shooting at the Falkners' residence, and concluded that the deputies were "EXONERATED from any departmental policy violations, and furthermore, [that] their actions were consistent with the good judgment, honor, and the law that they have all sworn to uphold." *Id.* at 39 (emphasis omitted).

In his report, Captain Myrick created a chronology of events. *Id.* at 5–6. As relevant here, Captain Myrick recorded that the deputies were within twenty or thirty yards of Mrs. Falkner's truck when they located it. *Id.* at 36; Doc. 109-7 at 71–72. He later conceded that Deputy Banks estimated that Mrs. Falkner's truck was between twenty or thirty feet from them when they found her, and when asked how he estimated twenty to thirty yards, he said, "I'd have to look at the [Task Force] information and data" and alternatively stated that it "could be a typo." Doc. 109-7 at 72–74.

Captain Myrick also estimated based on the footage and audio from the dash cameras that approximately eleven seconds elapsed between the deputies' discovery of Mrs. Falkner's truck and the truck's acceleration towards them. *See id.* at 81–82. He testified that he believed the deputies were "trying to give commands and instructions" during those eleven seconds. *Id.* at 82. He stated that "sometimes in certain situations," eleven seconds would be sufficient time to provide someone with warnings about using force, but that he did not believe the deputies had time to issue such warnings in this case. *See id.* at 93–95.

Captain Myrick also included in his report part of the data recorded by Mrs. Falkner's truck. He included the data reflecting that Mrs. Falkner's truck had a seventy-seven percent throttle input, which he said was "indicative of somebody pressing the throttle." *Id.* at 99–101; *see* Doc. 109-12 at 37. He testified that he did not include the other data because he was uncertain "at what instance" that data was recorded and because "there was no real question about [it] . . . the throttle had been pushed," which told him that Mrs. Falkner had "intent." Doc. 109-7 at 101.

Captain Myrick also included in his report that Deputy Cooper was in "immense . . . pain" when the truck ran over his leg. Doc. 109-12 at 37. He later testified that he included this description in his report in spite of his awareness that Deputy Cooper stated that he was not in pain because "given what happened, I don't see how you can not suffer from pain." Doc. 109-7 at 107.

Captain Myrick also testified to the deputies' compliance with certain policies. For instance, he testified that there was no policy that placed a time limit on how quickly the deputies completed their domestic violence investigation. *Id.* at 50. He testified that if the deputies' only justification for retrieving their patrol rifles was their belief that Mrs. Falkner might have a gun, that decision would not be in compliance with the Shelby County Sheriff's Office firearm policy, although other circumstances, such as the terrain of the property, render the deputies' decision in compliance with "the criteria as it's written in the policy." *Id.* at 52. He testified that

he considered "the unknowns" and "things that . . . [were] important to the incident itself, but . . . may not be specifically in writing in the policy" in his investigation. *Id.* at 8. He testified, "You do the best you can with what you've got . . . . The policies are there to support [an officer's] actions procedurally," *id.* at 78, and that there are "things that are in the policy that are not specifically written in," *id.* at 118.

Captain Myrick also testified that three deputies giving commands at the same time is "inconsistent" with the Shelby County Sheriff's Office policy. *Id.* at 49. But he testified that "in a stressful situation that's occurring in seconds when you're being surprised with something[,] it's not uncommon for people to resort to fight or flight." *Id.* He testified that it would be "unreasonable" for the deputies not to have a plan, although such a plan does not have to be "verbalized." *Id.* at 60–61. And he testified that he did not believe the deputies had the opportunity to deescalate the situation or to "tactically disengage" Mrs. Falkner. *Id.* at 70.

During his deposition, Captain Myrick testified about various conversations that he had with the deputies' attorney, Brian Kilgore, when Mr. Kilgore brought Captain Myrick a copy of his administrative report to review before his deposition. *Id.* at 18. Mr. Kilgore originally instructed Captain Myrick "not [to] speak to any of the discussions [they] had during th[eir] meetings," but Captain Myrick continued to testify about their discussions because they were not covered by the attorney client privilege. *Id.* Captain Myrick later returned from a break midway through the

deposition and informed counsel present that he had retained Mr. Kilgore as his attorney during that break. *Id.* at 77. Mr. Kilgore acknowledged that this relationship did not shield former discussions from disclosure, and Captain Myrick continued to testify about them. *Id.*

### E. Mr. Diver's Expert Witness

Mr. Diver, the administrator of Mrs. Falkner's estate, retained Allen Powers as an expert witness in this case. *See* Doc. 109-32 at 2. Mr. Powers earned his Master of Science in Mechanical Engineering and is licensed as a professional engineer. *Id.* at 2, 9. Mr. Powers's assistant inspected Mrs. Falkner's truck and the Falkners' property, *id.* at 2; Doc. 122-1 at 13–14, and Mr. Powers used that evidence form his opinions, *see* Doc. 109-32 at 7–15.

Mr. Powers opined in his report that the curtain airbags deployed in Mrs. Falkner's truck "due to forces coming from the left side." *Id.* at 10. He stated that "[b]ullet holes were present on the front and driver side [of the truck], with additional ones visible in the interior of the vehicle," *id.*, and opined that based on the data pulled from Mrs. Falkner's truck, "[t]he likely cause of the trigger event would be the left front tire engaging the embankment," which "eliminates the idea that the trigger of the airbag deployment was by a bullet." *Id.* at 14. He also opined that the "[l]ack of multiple bullet holes in the driver side curtain airbag indicates the shooting began before [its] deployment[,]" *id.*

Mr. Powers also stated in his report that the data recorded by the truck "allow[s] understanding of the vehicle's movements prior to impact." *Id.* at 13. He calculated that Mrs. Falkner's truck traveled approximately eight to eleven feet before hitting the embankment. *See id*. And he stated that the deputies' testimony that the truck never stopped moving is "consistent with the [truck] being [twenty or thirty] feet from the road, [and] inconsistent with . . . [twenty-five or thirty] yards." *Id.* at 14.

Mr. Powers opined that his review of the tire tracks on the scene indicated a "rearward" movement of tires but that there are no "spinning tire marks made in connection with the forward path of the [truck]." *Id.* at 11. He also opined that "[t]here is no evidence" supporting the assertion that the truck "tracked the [deputies'] movements" or that the truck "did anything but move forwards and leftward." *Id.* at 15.

Mr. Powers also refuted several assertions from Sergeant Jordan in his report. For instance, he refuted Sergeant Jordan's statement that the movement of Mrs. Falkner's truck and its impact with the embankment is visible on Deputy Cooper's dash camera because the "[p]rofile of the driveway and embankment does not allow visibility of the [truck] from the camera position at the gate." *Id.*

### F. The Present Lawsuit

Plaintiff William Diver, in his capacity as the Administrator of the Estate of Mrs. Falkner, sued Sheriff Samaniego, Captain Bishop, Deputy Davis, Deputy Cooper, and Deputy Banks in their individual and official capacities. *See* Doc. 1. In the operative complaint, Mr. Diver asserted his claims in three counts. In Count One, he alleged an excessive force claim against the deputies under 42 U.S.C. § 1983. *See* Doc. 37 at 10–11. In Count Two, he asserted a claim under the Alabama Wrongful Death Act, Ala. Code § 6-5-140, against all defendants. *See id.* at 11–26. In Count Three, he asserted a claim for failure to intervene against the deputies. *See id.* at 26–28.

All defendants moved to dismiss Count Two of the operative complaint. *See* Doc. 38. The court denied that motion in part because it concluded that state sovereign immunity did not apply to a sheriff and his deputies under recent Alabama case law. *See* Doc. 57.

All defendants subsequently moved for summary judgment in their favor. *See* Docs. 77, 79, 81, 97, 98. Mr. Diver did not oppose the motions for summary judgment by Sheriff Samaniego and Captain Bishop. Doc. 113. The motions for summary judgment by the deputies are fully briefed. *See* Docs. 110–12, 119.

The deputies also moved to strike evidence submitted in support of Mr. Diver's opposition to their summary judgment motions. *See* Doc. 117. Mr. Diver opposed that motion, *see* Doc. 122, and the deputies did not reply.

## II.    STANDARD OF REVIEW

A party moving for summary judgment must establish "that there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it could "affect the outcome" of the case. *Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1303 (11th Cir. 2016) (cleaned up). A material fact is in "genuine dispute" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (cleaned up). In deciding a motion for summary judgment, the court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "[T]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (cleaned up).

## III.    ANALYSIS

### A. The Motions For Summary Judgment by Captain Bishop and Sheriff Samaniego

Captain Bishop and Sheriff Samaniego argue that they cannot be held liable under Alabama law for failing to train or supervise the deputies and that Mr. Diver

has not established a causal connection between their conduct and any violation of the constitution by the deputies. *See* Doc. 77 at 14–16; Doc. 79 at 11–13. Mr. Diver does not contest these arguments. *See* Doc. 113.

In Count Two, Mr. Diver asserted a claim under the Alabama Wrongful Death Act against Captain Bishop and Sheriff Samaniego for "provid[ing] no or such inadequate supervision or training regarding restraint in the use of powerful weapons by their Deputies." Doc. 37 ¶ 120; *see, e.g., id.* ¶¶ 126, 131–32. Many district courts in this circuit have concluded that there is no cause of action against a supervisor for failing to train or supervise a subordinate under Alabama law. *See, e.g.*, *Rogers v. Alabama*, No. 2:21-cv-1065-ACA, 2022 WL 1032783, at *8–9 (N.D. Ala. Apr. 6, 2022) (concluding that Alabama law does not recognize a negligent hiring, training, or supervising claim against a police chief). Captain Bishop and Sheriff Samaniego asserted that they are not aware of a recent Alabama decision creating such a claim, *see* Doc. 77 at 15–16; Doc. 79 at 12–13, and Mr. Diver has not cited any.

In the event that Count Two could be read to assert a section 1983 claim against Captain Bishop and Sheriff Samaniego (which is untenable in the light of the failure to allege a constitutional violation within the count), Mr. Diver has not established the necessary "causal connection" between the actions of these defendants and any constitutional violation by the deputies. *See Ingram v. Kubik*, 30 F.4th 1241, 1254 (11th Cir. 2022) (explaining that a supervisor is liable for the

44

actions of a subordinate only where "there is a causal connection between his actions and the alleged constitutional deprivation") (cleaned up).

Therefore, the motions for summary judgment by Captain Bishop, Doc. 77, and Sheriff Samaniego, Doc. 79, are **GRANTED**.

## B. The Deputies' Motion To Strike

The deputies argue that three evidentiary submissions from Mr. Diver should be stricken from the record because they constitute inadmissible hearsay and are not properly sworn under 28 U.S.C. § 1746: (1) the Administrative Report, (2) the Task Force Report, and (3) Mr. Powers's expert report. *See* Doc. 117 at 1–5. They also argue that Mr. Powers's expert report should be stricken because he employed an assistant to help him create the report, that assistant was not disclosed to them, and Mr. Powers "lacked personal knowledge of the data collection and analysis" used in the report. *Id.* at 5–11 (emphasis omitted). And they argue that Mr. Powers's affidavit in support of his expert report is not sworn or verified under 28 U.S.C. § 1746. Doc. 117 at 12.

Mr. Diver responds that the evidence in the three reports may be considered at summary judgment because it can be reduced to an admissible form at trial. *See* Doc. 122 at 3–6. He also argues that the portions of the Administrative Report and Task Force report do not constitute hearsay because he relied on them in his opposition to summary judgment for impeachment purposes only. *Id.* at 6–11. And

he argues that (1) as an expert witness, Mr. Powers is permitted to base his opinions on facts that he "has been made aware of" under Federal Rule of Evidence 703, (2) the deputies do not attack Mr. Powers's qualification as an expert witness or the data he relied upon as unreliable, (3) he was not required to disclose Mr. Powers's assistant because the assistant "neither provided opinions, nor exercised professional judgment beyond Mr. Powers'[s] ken," and (4) that Mr. Powers's affidavit is properly sworn. Doc. 122 at 11–19.

As an initial matter, Section 1746 "permits unsworn declarations to substitute for a sworn affidavit or sworn declaration for purposes of summary judgment if" the "declarant dates and subscribes the document as true under penalty of perjury in" a specific form. *Roy v. Ivey*, 53 F.4th 1338, 1347–48 (11th Cir. 2022); *see* 28 U.S.C. § 1746. Mr. Powers's affidavit supporting his expert report was sworn under oath before a notary and is affixed with a notary seal, and therefore does not have to comply with the requirements of 28 U.S.C. § 1746. *See* Doc. 109-32 at 5.

In any event, a district court may consider evidence on summary judgment that can be reduced to an admissible form at trial. *See Rowell v. BellSouth Corp.*, 433 F.3d 794, 800 (11th Cir. 2005); *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293–94 (11th Cir. 2012). The reports at issue here would likely be admissible at trial. For instance, Mr. Diver could "have the hearsay declarant testify directly to the matter at trial," which in this case, would involve calling Captain Myrick, Sergeant

Jordan, and Mr. Powers to testify about the matters in each of their reports. *Jones*, 683 F.3d at 1294.

In addition, Mr. Powers is not required to have personal knowledge of the matters contained in his expert report and is entitled to rely on data that was given to him. *See* Fed. R. Evid. 703 ("An expert may base an opinion on facts or data in the case that the expert has been made aware of . . . ."); *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 (1993) ("Unlike an ordinary witness, . . . an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge . . . .").

Mr. Powers's use of an assistant does not preclude the court's consideration of his report. Although an expert may not "act[] as a mere conduit" for another, *Abrams v. Ciba Specialty Chemicals Corp.*, No. 08-0068-WS-B, 2010 WL 779283, at *4 (S.D. Ala. Mar. 2, 2010), "[a]n expert witness is permitted to use assistants in formulating his expert opinions[,]" *In re 3M Combat Arms Earplug Prods. Liability Litig.*, No. 3:19md2885, 2021 WL 830309, at *7 (N.D. Fla. Mar. 4, 2021) (quoting *Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 612 (7th Cir. 2002)). Where an expert "substantially participates in the preparation of his report, and the report reflects his actual views, the fact that he received assistance in developing his opinions is a matter of weight and credibility, not admissibility." *Id.* (cleaned up).

Mr. Powers testified at his deposition that he did not personally evaluate the scene of the shooting and that an "assistant engineer" examined it for him. Doc. 122-1 at 13. He testified that Mr. Jones "would do different things" for him, such as "go to the scene, collect data, take photographs, . . . do some assessment of some of the data, help draw up scenes, . . . help review documents, [and] help put the report together." *Id*. He also testified that Mr. Jones also processed certain data and "put that into [the company's] drawings." *Id.* at 14. Although this evidence demonstrates that Mr. Powers's assistant retrieved, compiled, and processed data, the evidence also indicates that Mr. Powers used that data to form his own opinions. For instance, Mr. Powers testified that he relied upon his thirty years of experience when writing his expert report, *id.* at 7, and he was able to testify about the basis of those opinions and his methods in forming them, *see, e.g.*, *id.* at 17, 22. Accordingly, Mr. Powers's use of an assistant does not render his expert report inadmissible on summary judgment.

For all of these reasons, the deputies' motion to strike, Doc. 117, is **DENIED**.

## C. The Deputies' Motion for Summary Judgment

### 1. Qualified Immunity

"Qualified immunity protects government officials performing discretionary functions from civil trials . . . and from liability if their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would

have known." *Ireland v. Prummell*, 53 F.4th 1274, 1297 (11th Cir. 2022) (cleaned up). "To receive qualified immunity, the official must first prove that he was acting within the scope of his discretionary authority when the allegedly unlawful conduct took place." *Hamlet v. Martin Corr. Inst.*, No. 21-11937, 2022 WL 16827438, at *3 (11th Cir. Nov. 9, 2022). Mr. Diver does not contest that the deputies were performing a discretionary function. *See generally* Docs. 110–12.

"Once an official establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to demonstrate (1) that the facts show that the official violated the plaintiff's constitutional rights and (2) that the law clearly established those rights at the time of the alleged misconduct." *Hamlet*, 2022 WL 16827438, at *3 (cleaned up).

Federal courts "may undertake these two inquiries in either order." *Barcelona v. Burkes*, No. 21-14285, 2022 WL 15137410, at *2 (11th Cir. Oct. 27, 2022) (cleaned up); *accord Christmas v. Harris Cnty.*, 51 F.4th 1348, 1354 (11th Cir. 2022) ("Courts are permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first.") (cleaned up).

### a. Count One: Excessive Force

The deputies argue that they are entitled to qualified immunity because they did not violate Mrs. Falkner's Fourth Amendment rights and "the law was not so

clearly established as to place [them] on notice" of a constitutional violation. Doc. 97 at 18; Doc. 98 at 13; *see* Doc. 81 at 12–21.

Mr. Diver argues that he has presented evidence from which "a jury could find that [the deputies] unreasonably seized Mrs. Falkner in violation of her Fourth Amendment right to be free from deadly force." Doc. 110 at 48. He argues that taking this evidence in his favor, the deputies (1) "did not have probable cause to believe that Mrs. Falkner posed an immediate risk of harm to [themselves] or to others," (2) "it was unreasonable for [the deputies] to believe that the use of deadly force was necessary to stop Mrs. Falkner from fleeing," and (3) "it was feasible for [the deputies] to warn Mrs. Falkner of the possibility that deadly force may be used prior to its use." *Id.* at 50. And he argues that the deputies' Fourth Amendment violation was clearly established by the Eleventh Circuit in *Morton v. Kirkwood*, 707 F.3d 1276 (2013). *See* Doc. 110 at 52–53.

### i. Constitutional Violation

"The Fourth Amendment provides a 'right of the people to be secure in their persons . . . against unreasonable . . . seizures.'" *Baxter v. Santiago-Miranda*, 121 F.4th 873, 887 (11th Cir. 2024) (quoting U.S. Const. amend. IV). "The Fourth Amendment's freedom from unreasonable seizures includes the right to be free from excessive force." *Id.* (cleaned up). Federal courts "measure excessive-force claims" by "ask[ing] whether the officer's conduct was objectively reasonable in [the] light

of the facts confronting the officer." *Patel v. City of Madison*, 959 F.3d 1330, 1338–39 (11th Cir. 2020) (cleaned up).

To determine when "the use of deadly force is 'reasonable' for purposes of the Fourth Amendment," courts should consider whether the officer who applied such force: (1) "has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others or that he has committed a crime involving the infliction or threatened infliction of serious physical harm," (2) "reasonably believes that the use of deadly force was necessary to prevent [the suspect's] escape," and (3) "has given some warning about the possible use of deadly force, if feasible." *Vaughan v. Cox*, 343 F.3d 1323, 1329–30 (11th Cir. 2003) (internal quotation marks omitted) (quoting *Tennessee v. Garner*, 471 U.S. 1, 105 (1985)). In evaluating these factors, the court is required to "view[] the facts and draw[] all reasonable inferences in [the plaintiff's] favor." *Id.* at 1330.

As to the first factor, a reasonable officer has probable cause to believe a suspect poses a threat of serious physical harm to the officer or another "where [a] plaintiff used or threatened to use his car as a weapon to endanger officers or civilians immediately preceding the officer's use of deadly force." *Underwood v. City of Bessemer*, 11 F.4th 1317, 1329 (11th Cir. 2021) (cleaned up).

The details of such an encounter are important. The Eleventh Circuit has determined that a reasonable officer would believe probable cause existed where a

vehicle was driving toward him at a speed of one or two miles per hour and the officer was approximately two or four feet away from the vehicle. *Robinson v. Arrugeta*, 415 F.3d 1252, 1254 (11th Cir. 2005). And it determined that a reasonable officer would believe probable cause existed where a suspect led an officer on a high-speed chase, wrecked, and then drove the car in reverse within two feet of the officer. *Tillis v. Brown*, 12 F.4th 1291, 1294 (11th Cir. 2021).

On the other hand, the Eleventh Circuit has determined that a reasonable officer would not have believed probable cause existed where an officer "was still eight feet away from" a vehicle, the suspect was "idling and inching forward," and the suspect did not accelerate the vehicle until after the officer had fired shots. *Underwood*, 11 F.4th at 1329–30. It has also determined that a reasonable officer would not believe that probable cause existed when he shot a suspect who was sitting in a running but stationary vehicle. *Morton*, 707 F.3d at 1281–82.

The parties present evidence supporting sharply different accounts of Mrs. Falkner's actions after the deputies found her. Taking the evidence in the light most favorable to Mr. Diver, a jury could find that the deputies shot Mrs. Falkner without warning as she was sitting in her stationary truck, before it was moving towards them.

For instance, a jury could credit Mr. Powers's testimony that (1) the curtain airbags did not deploy until Mrs. Falkner's truck hit the embankment, (2) the "[l]ack

of multiple bullet holes in the driver side curtain airbag indicates the shooting began before [its] deployment," and (3) the truck traveled a distance of only eight to eleven feet. *See* Doc. 109-32 at 2–3, 13. A jury could credit Deputy Cooper's testimony that the impact of the truck when it hit him was less than a "football hit," Doc. 109-27 at 9, and Sergeant Jordan's testimony that the four miles per hour speed recorded by the truck is "consistent with a car that's just in drive and rolling forward," Doc. 109-5 at 31, both of which suggest that the truck was moving slowly. And a jury could credit Mr. Powers's testimony that "[t]here is no evidence . . . that the [truck] did anything but move forward and leftward," Doc. 109-32 at 15, which contradicts the deputies' assertions that Mrs. Falkner steered the truck to track the deputies' movements, *see* Doc. 109-26 at 4; Doc. 109-27 at 6; Doc. 109-28 at 8.

If the deputies shot Mrs. Falkner while she was sitting in her truck and not moving, they cannot sustain their argument that a reasonable officer in their shoes would not have "probable cause to believe [she] pose[d] a threat of serious physical harm." *Vaughan*, 343 F.3d at 1329; *see Underwood*, 11 F.4th at 1329–30; *Morton*, 707 F.3d at 1281–82.

Considering the second and third factors, the deputies have not argued that deadly force was required to prevent Mrs. Falkner's escape, and it is undisputed that the deputies did not warn Mrs. Falkner that they were about to use deadly force. Doc. 119 at 28, 34.

Taking the evidence in the light most favorable to Mr. Diver, there is a genuine dispute of fact regarding the reasonableness of the deputies' use of deadly force, and the court cannot grant summary judgment on the ground that the deputies did not violate Mrs. Falkner's Fourth Amendment rights. *See Patel*, 959 F.3d at 1338.

### ii. Clearly Established Law

Even though a jury could reasonably find that the deputies violated Mrs. Falkner's Fourth Amendment rights, the deputies are nevertheless entitled to qualified immunity if that right was not clearly established. *See Morton*, 707 F.3d at 1282.

"For a right to be clearly established, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Corbitt v. Vickers*, 929 F.3d 1304, 1311 (11th Cir. 2019) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). One way that a plaintiff "can show that the state of the law gives officials fair warning of a clearly established right" is to "show that a materially similar case has already been decided." *Id.* at 1312 (cleaned up).

In the Eleventh Circuit, a right may be clearly established by "judicial decisions of the United States Supreme Court, the United States Court of Appeals for the Eleventh Circuit, and the highest court of the relevant state." *Id.* (quoting *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1199 & n.6 (11th Cir. 2007)). "[I]f case

law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant." *Gaines v. Wardynski*, 871 F.3d 1203, 1210 (11th Cir. 2017) (cleaned up).

Mr. Diver cites *Morton v. Kirkwood*, 707 F.3d 1276 (11th Cir. 2013). *See* Doc. 110 at 52–53; Doc. 111 at 50–51; Doc. 112 at 50–51. In that case, an officer used deadly force against a suspect who was, according to the plaintiff's "version of events," "mov[ing] at [a] coasting speed" of "about one mile per hour" away from the officers, but was sitting "stationary" in his vehicle when the officer shot him. *Morton*, 707 F.3d at 1279–82. The Eleventh Circuit determined that the officer's use of deadly force violated the plaintiff's Fourth Amendment rights because "[a] reasonable officer would not have shot [the suspect] under th[o]se circumstances." *Id.* at 1282.

*Underwood* is also relevant. 11 F.4th 1317. There, an officer used deadly force against the plaintiff who "was not obeying orders to stop and was evading talking to the police" but also (1) "was not driving aggressively or in a threatening way," (2) did not accelerate the vehicle until after the officers fired shots, (3) the officer closest to the vehicle was approximately eight feet away, and (4) the officer did not warn the plaintiff that he would use deadly force. *Id.* at 1330–32. The Eleventh Circuit determined the officer's use of deadly force was unreasonable under those circumstances. *See id.* at 1331–32.

Mr. Diver has presented evidence from which a reasonable jury could find that the deputies shot Mrs. Falkner while she was in her truck but was not rapidly moving towards the officers. *See supra* Part III.B.1.A.i. The credibility determinations and fact findings are the jury's to make. The deputies do not address Mr. Diver's citation to *Morton* in their reply brief, or argue that it does not clearly establish the constitutional violation. *See* Doc. 119 at 49–53. And they concede that "[a] deputy cannot shoot and kill someone just because that person starts the engine to [his or her] vehicle and put[s] it in drive." *Id.* at 14.

For all of the reasons stated above, there is a genuine dispute of material fact as to whether the deputies violated clearly established law when they shot Mrs. Falkner, and their motions for summary judgment as to Mr. Diver's excessive force claims (Count One) are **DENIED**.

### b. Count Three: Failure to Intervene

The deputies argue that they did not have time to intervene. *See* Doc. 97 at 33–35; Doc. 81 at 23–25; Doc. 98 at 23–26. They also argue that they are entitled to qualified immunity, *see* Doc. 97 at 35–37; Doc. 81 at 25–27; Doc. 98 at 26–28, and that Mr. Diver failed to point to any law clearly establishing that they were required to intervene under the circumstances presented to them. Doc. 119 at 58–60.

Mr. Diver responds that each deputy "could have stopped the others from sneaking up on Mrs. Falkner in the dark and 'lighting it up' with their rifle lights

pointed at her head and screaming incoherent 'commands' at her, thereby inducing her to try to retreat from the danger she perceived to be at hand." Doc. 110 at 54; Doc. 111 at 52; Doc. 112 at 52. He argues that the deputies' "failure to stop the threat and application of excessive force[] . . . set in motion the tragic and needless event that followed." Doc. 110 at 55; Doc. 111 at 53; Doc. 112 at 53.

Mr. Diver does not point this court to any case clearly establishing that failing to stop fellow deputies from walking towards a suspect in the dark with patrol rifles violates the suspect's Fourth Amendment rights. *See* Doc. 110 at 54–55; Doc. 111 at 52–53; Doc. 112 at 52–53. Therefore, the deputies are entitled to qualified immunity for Mr. Diver's failure to intervene claims against them. *See Jackson v. City of Atlanta*, 97 F.4th 1343, 1363–64 (11th Cir. 2024) (concluding that an officer was entitled to qualified immunity where the plaintiff did not cite a decision "establishing that, in the circumstances of [that] case, [the officer] violated [the plaintiff's] clearly established rights by [failing to] interven[e]").

Accordingly, the deputies' motions for summary judgment as to Mr. Diver's failure to intervene claims (Count Three) are **GRANTED**.

### 2. State-Agent and Peace Officer Immunity

The deputies argue that they are entitled to state-agent and peace officer immunity for Mr. Diver's wrongful death claims against them. *See* Doc. 97 at 28–32; Doc. 81 at 21–23; Doc. 98 at 18–23. The deputies did not re-assert their

arguments relating to state immunity under Article I, Section 14 of the Alabama Constitution. *See* Doc. 97 at 29 & n.2; Doc. 98 at 19 & n.1; Doc. 81 at 21 & n.2.

Mr. Diver responds and argues only that the deputies are not entitled to state immunity under Article I, Section 14 of the Alabama Constitution. *See* Doc. 110 at 55–57; Doc. 111 at 53–55; Doc. 112 at 53–55.

Three types of immunity exist under Alabama law: (1) state immunity under Ala. Const. art. I, § 14, *see Ex parte Cooper*, 390 So. 3d 1030, 1036 (Ala. 2023); (2) state agent immunity under *Ex parte Cranman*, 792 So. 2d 392 (Ala. 2000), as modified by *Hollis v. City of Brighton*, 950 So. 2d 300 (Ala. 2006); and (3) peace officer immunity under Ala. Code § 6-5-338(a). The application and exceptions for those immunities vary depending on which one is asserted. *Compare Ex parte Cooper*, 390 So. 3d at 1036 (explaining the application of state immunity) *with Ex parte City of Montgomery*, 402 So. 3d 810, 813–15 (Ala. 2024) (explaining the application of state agent immunity and peace officer immunity).

State agent immunity and peace officer immunity protect state agents from civil liability in their personal capacities when the state agent is "exercising judgment in the enforcement of the criminal laws of the State, including . . . serving as [a] peace officer[] under" Alabama Code § 6-5-338(a). *See Ex parte Montgomery*, at 813–14 (cleaned up). Section 6-5-338(a) provides "immunity from tort liability

arising out of [an officer's] conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties."

If an officer establishes that "the plaintiff's claims arise from a function that would entitle [him] to immunity[,] . . . the burden then shifts to the plaintiff to show" that (1) federal or state law "require[s] otherwise" or (2) the officer acted "willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law." *Ex parte City of Montgomery*, 402 So. 2d at 814 (cleaned up).

The deputies were engaged in a discretionary function within the line and scope of their duties by responding to a call and investigating the complaint made therein. *See, e.g.*, *Ex parte City of Homewood*, 231 So. 3d 1082, 1087–88 (Ala. 2017) (stating that officers were exercising discretion in pursuing a vehicle); *Swan v. City of Hueytown*, 920 So. 2d 1075, 1078–79 (Ala. 2005) (explaining that an officer was "exercising judgment" by "gathering . . . information") (cleaned up).

Accordingly, the burden shifted to Mr. Diver to establish that an exception to immunity applied. *See Ex parte City of Montgomery*, 402 So. 2d at 814. Mr. Diver argued in a conclusory fashion that taking his "factual allegations as true," the deputies "acted in bad faith and beyond their authority" and "under a mistaken interpretation of the law." *See* Doc. 110 at 57; Doc. 111 at 55; Doc. 112 at 55. But he did not point the court to any evidence or law supporting such an argument. Mr.

Diver has thus not established that any of these exceptions apply. *See* Doc. 110 at 55–57; Doc. 111 at 53–55; Doc. 112 at 53–55.

Accordingly, the deputies' motions for summary judgment as to Mr. Diver's wrongful death claims (Count Two) are **GRANTED**.

## IV.   CONCLUSION

The motions for summary judgment by Sheriff Samaniego and Captain Bishop, Docs. 77, 79, are **GRANTED**, and the Clerk of the Court is **DIRECTED** to terminate them as defendants on the docket. The deputies' motion to strike, Doc. 117, is **DENIED**. The motions for summary judgment by the deputies, Docs. 81, 97, 98, are **GRANTED IN PART** and **DENIED IN PART**.

**DONE** and **ORDERED** this 30th day of September, 2025.



**ANNA M. MANASCO**
UNITED STATES DISTRICT JUDGE